NEWPORT COURT CLUB AS-
SOCIATES d/b/a Newport
Athletic Club et al.

v.

TOWN COUNCIL OF THE TOWN
OF MIDDLETOWN et al.

No. 2000-7-Appeal.

Supreme Court of Rhode Island.

June 19, 2002.

Randall L. Souza, Providence, for Plaintiff.

Steven M. Richard/Peter J. McGinn, for Defendant.

Present: LEDERBERG, BOURCIER, FLANDERS, GOLDBERG, JJ., and WEISBERGER, C.J. (ret.).

## OPINION

LEDERBERG, Justice.

If the General Assembly authorizes the town council of a home-rule municipality to include charges for sewer-related debt service and capital costs on its sewer bills, does the levy need to be approved by a town referendum? It is our opinion that it does not require voter approval in this case in which the plaintiff, Newport Court Club Associates d/b/a Newport Athletic Club (Newport Court or plaintiff),[1] has challenged the constitutionality of a statute that authorized the town council of the Town of Middletown (the town) to charge the town's sewer users and abutters for the debt service and capital costs of the town's sewerage system. A Superior Court judgment denied Newport Court's

---

1. Although Newport Court was the only named plaintiff in the verified complaint, "all other sewer-fee ratepayers for the tax year 1999–2000 in the Town of Middletown, Rhode Island," were also designated as plaintiffs.

Newport Court did not move for class certification prior to the entry of final judgment in favor of the Town of Middletown, and Newport Court remains as the only plaintiff in this case.

request for a permanent injunction against the collection of sewer fees for the 1999–2000 tax year and for a declaratory judgment that the challenged statute and the town's 1999–2000 sewer budget are unconstitutional and void. Newport Court appealed; we affirm the judgment.

## Facts and Procedural History

Middletown's home-rule charter became effective in 1968. Under the Middletown sewer enabling act (the act) that predated the charter, the town was authorized to issue bonds and temporary notes and to prescribe annual charges for users in order to construct and maintain a sewer system. Public Laws 1941, ch. 1103, as amended, *inter alia*, by P.L.1958, ch. 138, §§ 3, 5, 9. Each year, under this authority, the town has issued sewer bills to Middletown's owners of property connected to the town's sewerage system. In 1993 and 1994, Newport Court and several other commercial property owners sued the town, alleging, *inter alia*, that the town lacked the authority to include charges for debt service and capital costs in its sewer bills. *Newport Court Club Associates v. Town Council of Middletown*, 716 A.2d 787, 789 (R.I.1998) (*Newport Court Club I*). This Court agreed and held that any authority to assess such charges must derive from an act of the General Assembly. *Id.* at 790. This Court further pointed out that the Middletown sewer enabling act had never been amended to allow such authority, and at the time *Newport Court Club I* was decided, the act "specifically prohibit[ed] Middletown from assessing sewer users for debt service incurred as a result of the construction of the sewer system." *Id.*

In April 1999, presumably in response to this Court's opinion in *Newport Court Club I,* the town council passed a resolution supporting and approving the introduction of state legislation to amend the act to permit the town—at its discretion—to charge sewer users for the cost of debt service and capital improvements related to the sewerage system. The General Assembly enacted such legislation in July 1999 and authorized the town to include the cost of "construction, capital improvement, [and] debt service" in its annual sewer charges, "as the town council deems appropriate." Public Laws 1999, ch. 318, § 1 (the 1999 authorization or amendment). The 1999 authorization also provided that "[p]ayment for such bonds and notes may be apportioned among all taxpayers or only among the users of the sewerage works, as the town council deems appropriate," and it deleted a requirement directing that "[t]he cost of construction of the sewerage works and the debt service on obligations issued therefor shall be met from the general funds of the town." *Id.* The 1999 legislative authorization was not submitted to the town's electors for approval.

In reliance on the authorization, the town passed its 1999–2000 sewer budget with sewer assessments that undisputedly included charges attributable to debt service. The 1999–2000 budget did not include any charges under the line item for capital costs, although Newport Court claimed that charges attributable to construction costs and capital improvements were included in the guise of maintenance and repair. For the purposes of this opinion, we assume that both debt service and capital costs were included in the town's 1999–2000 sewer budget.

Newport Court filed suit against the town council of the town, by and through its members, and against the State of Rhode Island, by and through the Attor-

ney General[2] (collectively, defendants), requesting a declaratory judgment that the 1999 authorization was unconstitutional and, consequently, that the town's 1999–2000 sewer budget was null and void. Newport Court also sought a permanent injunction to prevent the town from issuing sewer bills and collecting sewer fees based on the 1999–2000 budget. Its motion for a temporary restraining order was denied, and the trial justice ordered that Newport Court's request for a preliminary injunction be expedited and consolidated with a hearing on the merits, pursuant to Rule 65(a)(2) of the Superior Court Rules of Civil Procedure.

On September 3, 1999, one week before the first installment payments were due under the contested sewer bills, the trial justice issued a written decision in favor of defendants. After final judgment was entered, Newport Court appealed and argued that absent a town referendum, the 1999 authorization (1) violated the home-rule provision of the Rhode Island Constitution, (2) deprived the town's sewer users of due process and equal protection under the law, and (3) represented an unconstitutional delegation of power by the General Assembly.[3] Additional facts will be added as required in addressing the issues on appeal.

2. The Attorney General declined to intervene or respond to the constitutional issues raised by Newport Court.

3. After oral argument in December 2001, four members of this Court were evenly divided on the issues raised by this appeal, and therefore the judgment of the Superior Court was sustained. Newport Court's petition for reargument was granted, and the case was reargued before a five-member panel in May 2002.

4. Article 13, section 4, of the Rhode Island Constitution states:

"The general assembly shall have the power to act in relation to the property, affairs and

### Standard of Review

■ In assessing Newport Court's challenge to the constitutionality of the 1999 authorization, "we begin with the principle that legislative enactments of the General Assembly are presumed to be valid and constitutional." *Rhode Island Depositors Economic Protection Corp. v. Brown*, 659 A.2d 95, 100 (R.I.1995). "In addition, the party challenging the constitutional validity of an act carries the burden of persuading the court that the act violates an identifiable aspect of the Rhode Island or United States Constitution." *Id.* (citing *Brennan v. Kirby*, 529 A.2d 633, 639 (R.I.1987)).

■ The material facts in this case were undisputed, and the trial justice resolved disputed issues as a matter of law. We review *de novo* questions of law and also mixed questions of law and fact in which constitutional issues are involved. *Rhode Island Depositors Economic Protection Corp. v. Bowen Court Associates*, 763 A.2d 1005, 1007 (R.I.2001); *Foley v. Osborne Court Condominium*, 724 A.2d 436, 439 (R.I.1999).

### Home Rule

On appeal, Newport Court argued that the 1999 authorization violated article 13, section 4,[4] of the Rhode Island Constitu-

government of any city or town by general laws which shall apply alike to all cities and towns, but which shall not affect the form of government of any city or town. The general assembly shall also have the power to act in relation to the property, affairs and government of a particular city or town provided that such legislative action shall become effective only upon approval by a majority of the qualified electors of the said city or town voting at a general or special election, except that in the case of acts involving the imposition of a tax or the expenditure of money by a town the same shall provide for the submission thereof to those electors in said town qualified to vote

tion, which requires that specific legislation affecting "the property, affairs and government" of a particular home-rule community be approved by a majority of the town's electors. The town, on the other hand, contended that the 1999 authorization was enacted pursuant to the Legislature's exclusive authority under section 5 of article 13,[5] and therefore, the enactment did not require the approval of the local electorate.

We agree with Newport Court's assertion that, in general, once a town has duly adopted a home-rule charter pursuant to article 13, section 2,[6] of the state constitution, the General Assembly may not enact special legislation affecting a local matter in that particular town unless the legislation is approved by a majority of the qualified electors of the town. R.I. Const. art. 13, sec. 4; *Bruckshaw v. Paolino,* 557 A.2d 1221, 1223 (R.I.1989); *Opinion to the House of Representatives,* 79 R.I. 277, 280, 87 A.2d 693, 696 (1952). We further recognize that the regulation of sewers and drains, including the power to expand and maintain a sewerage system, is generally a matter of purely local concern. *Newport Court Club I,* 716 A.2d at 790; *Westerly Residents for Thoughtful Development, Inc. v. Brancato,* 565 A.2d 1262, 1264 (R.I.1989).

Notwithstanding its impact on a local matter, however, a general or special act of the Legislature that authorizes a city or town to assess taxes or to borrow money does not require local voter approval because the General Assembly retains exclusive power under article 13, section 5, over matters relating to municipal taxation and borrowing. R.I. Const. art. 13, sec. 5; *Warwick Mall Trust v. State,* 684 A.2d 252, 254–55 (R.I.1996); *Opinion to the House of Representatives,* 79 R.I. at 280, 87 A.2d at 696. As this Court reaffirmed in *Warwick Mall Trust's* in-depth analysis of this issue:

"[U]nder the Rhode Island Constitution, the General Assembly retains its plenary power to enact special tax-enabling laws in relation to a particular city or town, notwithstanding that municipality's adoption of a home rule charter. And it can do so without having first to obtain the voters' approval in that home-rule municipality because local tax-enabling acts * * * that affect a city's power to levy, to assess, and to collect property taxes or to borrow money are not subject to article XIII, section 4's requirement of local voter approval." *Warwick Mall Trust,* 684 A.2d at 255.

Therefore, the question of whether local voter approval was required before the 1999 authorization could be implemented turns on whether the amendment constituted authorization "to levy, assess and collect taxes or to borrow money" under article 13, section 5.

On this question, the trial justice found:

"Whether the assessments amount to fee, taxes, or any other title, they have already been declared by the Supreme

upon a proposition to impose a tax or for the expenditure of money."

**5.** Article 13, section 5, of our constitution provides:

"Nothing contained in this article shall be deemed to grant to any city or town the power to levy, assess and collect taxes or to borrow money, except as authorized by the general assembly."

**6.** Article 13, section 2, states:

"Every city and town shall have the power at any time to adopt a charter, amend its charter, enact and amend local laws relating to its property, affairs and government not inconsistent with this Constitution and laws enacted by the general assembly in conformity with the powers reserved to the general assembly."

Court in *Newport Court Club I* to be permitted only by the General Assembly."

Having so found, the trial justice concluded:

> "The analysis in this matter begins and ends with the statement that the General Assembly retains exclusive power to legislate by general or special acts in granting to a city or town the power to 'levy, assess and collect taxes or to borrow money.' * * * The foregoing assertion was upheld in *Newport Court Club I*, and the Town acted upon that decision to suggest legislation to the General Assembly [the 1999 amendment]. The General Assembly properly enacted the 1999 [amendment] under § 5 and not § 4 of the Rhode Island Constitution. Therefore, a majority vote of the Town's electorate is unnecessary."

We agree with this analysis.

■ In *Newport Court Club I*, this Court acknowledged that "sewer charges are not ordinarily to be considered a tax," 716 A.2d at 790 (citing *Costello v. Ricci*, 121 R.I. 509, 512, 401 A.2d 38, 40 (1979)), and we observed that assessments for debt service and capital improvements "extend beyond the permissible annual-use charges." *Id.* Consequently, we held that the town had no inherent authority to assess such costs, absent authorization from the General Assembly. *Id.* at 790–91. We further noted that, as of the date of that opinion, the Middletown sewer enabling act lacked such authorization. *Id.* Accordingly, the town did exactly what *Newport Court Club I* directed it to do: it obtained the General Assembly's authorization to levy charges for debt service and capital improvements. It is our opinion that the 1999 legislative authorization constituted a proper exercise of the General Assembly's exclusive powers in matters of taxation

and borrowing money under article 13, section 5, and thus the approval of the town's electors was not required for its implementation. To hold otherwise would be to eviscerate and nullify this Court's holding in *Newport Court Club I*. Moreover, it would "be at odds with article XIII, section 5's refusal to grant cities and towns *any* power with respect to local taxation [and borrowing] except as authorized by the General Assembly." *Warwick Mall Trust*, 684 A.2d at 255.

In an attempt to distinguish our holding in *Warwick Mall Trust*, Newport Court pointed to footnote 9 of that decision, which stated:

> "Section 4 of the home rule article does provide that 'in the case of acts involving the imposition of a tax or the expenditure of money by a town the same shall provide for the submission thereof to those electors in said town qualified to vote upon a proposition to impose a tax or for the expenditure of money.' However, because the Enabling Act merely 'authorize[s]' the EDC and the city of Providence to enter into a tax treaty * * *, *it does not involve 'the imposition of a tax or the expenditure of money by a town, as distinguished from a city * * *.' * * * Thus it does not come within the tax-imposition or money-expenditure-by-a-town provision of article XIII, section 4, but instead falls within the General Assembly's reserved section 5–power to authorize particular municipalities to act on local tax matters." *Warwick Mall Trust*, 684 A.2d at 255 n. 9 (quoting *Opinion to the House of Representatives*, 79 R.I. at 280, 87 A.2d at 696). (Emphasis added.)

Because the case at bar involves a town, rather than a city, Newport Court argued that our holding in *Warwick Mall Trust* cannot be applied here, and therefore, the

1999 authorization must be submitted to the town's electors for approval, as provided by the tax-imposition clause of article 13, section 4. Newport Court's argument overlooks several facts.

Historically in Rhode Island, cities and towns were incorporated and established by acts promulgated by the General Assembly. These acts, referred to as Legislative Charters, prescribed the form of government of the municipal corporations. The charters distributed the powers of governance among various entities in the cities and towns.

The defining distinction between a city and a town was the method by which taxes were levied and the expenditure of money was authorized. In a city, taxes were levied and expenditures were authorized by an elected representative body generally called a city council (some governing bodies were bicameral, consisting of a city council and a board of aldermen). The legislative body of each city shared governance with a mayor, who participated in the legislative process by presenting a budget to the legislative body and by assenting to or vetoing ordinances enacted by the legislative body.

In towns, taxes were assessed and expenditure of money was authorized by a financial town meeting in which all taxpaying voters theoretically could participate. The financial town meeting would take place annually and on such other special occasions as might be deemed necessary by the town council. At the financial town meeting, a budget would be presented and expenditures would be recommended by the town council. The budget as adopted would be implemented by a levy of taxation adopted by the qualified voters who attended the financial town meeting.

When the Home Rule Amendment was adopted by the voters and included as article 13 of the Rhode Island Constitution, section 4 preserved the distinction between cities and towns by requiring that "acts involving the imposition of a tax or the expenditure of money by a town" should be submitted "to those electors in said town qualified to vote upon a proposition to impose a tax or for the expenditure of money." This section was designed to preserve the integrity of the financial town meeting and the authority of taxpayers to vote on the imposition of a tax or the expenditure of money.

At the time this Court issued its *Opinion to the House of Representatives,* 79 R.I. 277, 87 A.2d 693 (1952), towns generally held financial town meetings in which qualified electors voted on appropriations issues, whereas cities looked to a city council to fulfill this function. In Middletown, however, as in about a dozen of Rhode Island's towns, financial town meetings no longer are held. Rather, the town council has assumed many of the functions formerly performed by the town's "qualified electors" at the financial town meeting. Specifically, § 102 of the Middletown Town Charter provides:

> "Pursuant to the provisions of this Charter and subject only to the limitations imposed by the state Constitution and by this Charter, *all powers of the town, including those powers formerly vested in and exercised by the financial town meeting which is hereby discontinued, shall be vested in an elected town council,* which shall enact local legislation, and in a town administrator appointed by the town council in the manner provided below, who shall be responsible to the council for the execution of the laws and the administration of the town government." (Emphasis added.)

Moreover, the powers vested in the town council by the charter explicitly include the authority:

"To order the raising by a tax upon real and personal estate of such sums of money as may be required to pay town debts and defray the necessary charges and expenses of the town, and *to order the assessment, levying or imposing of any other taxes for the support of the town which legally may be assessed, levied or imposed under any general or special laws* which are now or may hereafter be in existence." Middletown Town Charter § 207(e). (Emphasis added.)

Significantly, the charter does not require the approval of such taxes and assessments by the local electorate. On the contrary, the charter requires a referendum only when and if *bonds* are issued "pledging the credit of the town in excess of one hundred thousand ($100,000.00) dollars in any one fiscal year." *Id.* at § 207(g). This case does not involve a bond issue; rather, it deals with the levying of funds to defray capital costs and to repay a debt that previously was authorized. Thus, with respect to the issues raised by this appeal, any distinction between cities and towns is vestigial.[7] To seize upon the half-century-old distinction in this case would be to perpetuate an anachronism, and to ignore Middletown's chosen form of government. This we decline to do.[8]

Section 4 of article 13 prohibits only tax or spending mandates from the General Assembly directed to a particular town without obtaining the approval of the local electorate. Section 5, reciprocally, prohib-

its a town or city from taxing its citizens without prior authorization of the Legislature. Nothing in the present case upsets this delicate allocation of power. When, as here, the town, pursuant to Section 5, has obtained the authorization of the General Assembly, to tax and/or spend on a local measure such as sewers, local voter approval is not required. Because the 1999 authorization is not a mandate from the Legislature but is merely an enabling act granting the town the authority to tax and/or spend *at its discretion*, the voter-approval safeguard included in section 4, barring a General Assembly tax-and-spend mandate to a particular municipality, is not triggered.

The issue in *Warwick Mall Trust* and the legislative amendment in this case did not "involve the imposition of a tax," nor did it involve the "expenditure of money by a town." *Warwick Mall Trust*, 684 A.2d at 255 n. 9. Rather, as we stated earlier, the 1999 legislation *authorized* a levy, but the imposition of any assessment was left to the town. Therefore, the tax-imposition and expenditure of money provisions of article 13, section 4, are inapplicable, and our holding in *Warwick Mall Trust* is dispositive of this case. In *Warwick Mall Trust*, this Court carefully considered the issue of local voter approval, and we held unequivocally that such approval is not required when the Legislature exercises its authority under article 13, section 5:

---

7. In concluding that the distinction that this Court drew between cities and towns in *Opinion to the House of Representatives*, 79 R.I. 277, 280, 87 A.2d 693, 696 (1952), fails to provide a meaningful distinction in this case, we do not conclude, as the dissent suggests, that "[i]n towns that no longer have a financial town meeting, * * * Article 13, section 4, is no longer applicable." Rather, we conclude that Middletown's status as a town is irrelevant to the application of our holding in

*Warwick Mall Trust v. State*, 684 A.2d 252 (R.I.1996), which governs the interplay between sections 4 and 5 of article 13, specifically with respect to tax-enabling legislation enacted by the General Assembly.

8. In so holding, we note that G.L.1956 § 43–3–9, on the construction and effect of the general laws, states that "[t]he word 'town' may be construed to include city."

"If * * * local voters in a home-rule city or town * * * have the right to approve any specific tax-enabling legislation enacted by the General Assembly pertaining to their municipality, then the Legislature would be powerless to pass such laws without first obtaining local voter approval. However, this result would be inconsistent with the conclusion we reached in *Opinion to the House of Representatives* that the General Assembly retains the *exclusive* power to authorize local taxation by general or *special* acts." *Warwick Mall Trust,* 684 A.2d at 254.

Significantly, the 1999 authorization amended the 1941 sewer enabling act, which authorized the town to borrow money, an exclusive power reserved to the General Assembly under article 13, section 5. The General Assembly's power to authorize a town to borrow money also necessarily includes the power to prescribe the manner of *repayment* of the borrowed funds. Here, the 1999 authorization altered the terms of repayment for an expenditure that already had been sanctioned by the Legislature. The General Assembly clearly retains control over local enabling legislation that it has enacted or amended pursuant to its exclusive powers under article 13, section 5, and it follows that cities and towns lack the power to veto such legislation through the mechanism of local referenda. *Warwick Mall Trust,* 684 A.2d at 254.

In support of its position, Newport Court has emphasized the fact that, with the exception of the 1999 authorization, "every legislative aspect of the Middletown Sewer Enabling Act has since its inception been submitted to and approved by the voters of the Town of Middletown." In *Newport Court Club I,* we recognized that until that time, "[a]ll * * * acts of the General Assembly that ha[d] authorized the issuance of additional bonds for sewer expansions * * * ha[d] specifically referred to the sewer enabling authority and ha[d] required the approval of electors, as well as referring to specific provisions for repayment." *Newport Court Club I,* 716 A.2d at 791. That precedent led us to conclude that "the General Assembly intended that these obligations be the responsibility of all Middletown taxpayers and not be borne exclusively by the users of the sewer system." *Id.* In enacting the 1999 amendment, however, the Legislature clearly and unambiguously delegated to the town the authority to include the cost of "construction, capital improvement, [and] debt service" in its annual sewer assessments and specified that "[p]ayment for [all bonds and all temporary notes issued under the act] may be apportioned among all taxpayers or only among the users of the sewerage works, as the town council deems appropriate." Public Laws 1999, ch. 318, § 1.

Although the Legislature *could* have required approval of the 1999 authorization by a majority of the town's electorate, our opinion in *Warwick Mall Trust* and the town charter make clear that neither the Legislature nor Middletown was under any obligation to do so. 684 A.2d at 254–55. When, as in this case, the General Assembly has exercised its exclusive authority under article 13, section 5, to enact special enabling legislation related to municipal taxation or borrowing, approval of the legislation by the electorate of the affected municipality is not constitutionally mandated. *Warwick Mall Trust,* 684 A.2d at 254–55. Consequently, the implementation of the 1999 authorization, without local voter approval, did not violate the home-rule provisions of the Rhode Island Constitution.

### Equal Protection

Newport Court also contended that the 1999 authorization violates the

equal protection guarantees of the state and federal constitutions.[9] In assessing whether an enactment violates equal protection standards, "we must examine both the nature of the classification established by the act and the individual rights that may be violated by the act." *Brown,* 659 A.2d at 100 (citing *Boucher v. Sayeed,* 459 A.2d 87, 91 (R.I.1983)). "If a statute either infringes upon fundamental rights or results in the creation of a suspect classification, the statute must be examined with strict scrutiny." *Id.* On the other hand, legislation that neither implicates a suspect class nor infringes upon a fundamental right is subject to rational-basis review. *Id.* (citing *City of Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313, 320 (1985)); *In re Advisory Opinion to the House of Representatives,* 519 A.2d 578, 583 (R.I.1987). It is undisputed that the 1999 authorization was "economic legislation," requiring only a rational relationship to a legitimate state interest. *City of Cleburne,* 473 U.S. at 440, 105 S.Ct. at 3254, 87 L.Ed.2d at 320; *Town of Lincoln v. City of Pawtucket,* 745 A.2d 139, 145 (R.I. 2000).

█ Newport Court argued that the Legislature failed to articulate the state interest that is advanced by the 1999 authorization or describe how the amendment relates to that interest. Surmising that the legislation was intended to advance the state's interest in public health and safety, Newport Court argued that by permitting the town to tax only sewer users for debt service and capital costs related to the town's sewerage system, the

1999 authorization resulted in "an arbitrary, irrational and discriminatory classification with no rational relationship to the public safety or health." We disagree.

█ Economic legislation such as the 1999 authorization to levy a sewer assessment is cloaked with a presumption of constitutionality. This Court will interfere with the discretion of the Legislature to establish "legislative classifications in the socioeconomic realm," *In re Advisory Opinion to the House of Representatives,* 519 A.2d at 583, only if it can be shown that the distinctions do not "rest upon any reasonable basis," but are "essentially arbitrary." *Id.* (quoting *Lindsley v. Natural Carbonic Gas Co.,* 220 U.S. 61, 79, 31 S.Ct. 337, 340, 55 L.Ed. 369, 377 (1911)). As we stated in *Town of Lincoln:*

"The legislative power is plenary, and as long as its chosen method bears a rational relationship to the legitimate end to be achieved, neither municipalities nor individuals may challenge the legislative choice solely on the ground that they could devise a better or more accurate method." *Town of Lincoln,* 745 A.2d at 144.

In this case, both options are rational: either the debt service and capital costs of the town's sewerage system can be included as a fee to the users of that system, or the costs can be assessed as a tax upon all the town's citizens. Because neither alternative is arbitrary, the Legislature could have chosen either of the two rational courses of repayment. As discussed *post,* the Legislature acted within its power in assigning capital costs to the sewer users

9. Article 1, section 2, of the Rhode Island Constitution provides in pertinent part: "No person shall be deprived of life, liberty or property without due process of law, nor shall any person be denied equal protection of the laws."

The Fourteenth Amendment to the United States Constitution provides in pertinent part: "[N]or shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1.

but delegating to the town council the choice of assigning the costs of debt service to users or to all taxpayers. Our declaration in *Newport Court Club I,* 716 A.2d at 790, that such costs extended "beyond the permissible annual-use charges," acknowledged that Middletown possessed neither the inherent authority nor was it authorized by statute to assess such costs at that time. Contrary to Newport Court's interpretation, *Newport Court Club I* did not "conclusively determine[ ]" that such costs should be "general obligations borne by all taxpayers within the Town," nor did our holding restrict the Legislature's discretion to distribute the burden of such costs "among all taxpayers or only among the users of the sewerage works, as the town council deems appropriate." Public Laws 1999, ch. 318, § 1. Therefore, Newport Court's equal protection argument fails.

### Due Process and the Statutory Maximum Tax Levy

■ Newport Court further argued that the passage of the 1999 authorization and the town's 1999–2000 sewer budget violated its due process rights under the state and federal constitutions, (1) by depriving the town's voters of their constitutional right under article 13, section 4, of the Rhode Island Constitution "to vote on and either approve or disapprove economic legislation, which affects the property, affairs and government of Middletown only," and (2) by "unlawfully seek[ing] to avoid the maximum legislative cap on annual tax levies, as set forth in [G.L.1956] § 44–5–2." The plaintiff's first argument essentially restates the assertion that local voter approval is required under the home-rule provisions of the Rhode Island Constitution. Because it is clear that the authorization was enacted under article 13, section 5, not article 13, section 4, and because the town charter vests those powers formerly exercised by the financial town meeting in the town council, we reject this argument.

Newport Court also alleged that the assessments for debt service and capital costs in the town's 1999–2000 sewer budget constituted an illegal tax, in excess of the maximum levy established by G.L.1956 § 44–5–2. Under the statute, "[a] city and town may levy a tax in an amount not more than five and one-half percent (5.5%) in excess of the amount levied and certified by that city or town for the prior year." The statute also provides for exceptions to the maximum levy. Section 44–5–2(c).

Middletown admitted that "if it were required to transfer charges for debt service and capital improvements from the sewer bills onto the Town's 1999–2000 tax assessments, the Town would exceed the 5.5% levy cap allowed by * * * § 44–5–2." But the town disputed Newport Court's characterization of the charges as a "disguised tax," contending that the 1999 authorization gave the town "the ability to make special assessments of debt service and capital improvements upon the lands using sewer services, rather than recapturing such costs through general taxation." We agree. Because the Legislature specifically authorized the town to include the assessments in its annual sewer charges, rather than assess them through general taxation, the town did not exceed the maximum levy cap imposed by § 44–5–2.

### Delegation of Power by the General Assembly

■ Last, Newport Court contended that the 1999 amendment amounted to an unconstitutional delegation of power by the General Assembly because it gave the town unbridled discretion to determine whether to charge all taxpayers or only sewer users for the debt service of the town's sewerage system. The town re-

sponded by arguing that Newport Court had waived any challenge on nondelegation grounds by failing to identify the issue in its complaint. Further, even if the issue had not been waived, the 1999 authorization was not an unconstitutional delegation of power because the people of the town ultimately retain the power of the ballot in voting for town council members.

 Article 6, sections 1 and 2, of the state constitution "forbid the unconditional delegation of legislative power." *Town of East Greenwich v. O'Neil*, 617 A.2d 104, 112 (R.I.1992). The nondelegation doctrine serves two purposes: it insures "the protection of citizens against discriminatory and arbitrary actions of public officials," *Marran v. Baird*, 635 A.2d 1174, 1179 (R.I.1994) (citing *Davis v. Wood*, 427 A.2d 332, 335 (R.I.1981)), and it provides "the assurance that duly authorized, politically accountable officials make fundamental policy decisions." *Id.* (citing *Bourque v. Dettore*, 589 A.2d 815, 817 (R.I. 1991)). Yet, the doctrine "does not entirely prohibit the General Assembly from delegating portions of its legislative power so long as the delegation is reasonable," *Metals Recycling Co. v. Maccarone*, 527 A.2d 1127, 1129 (R.I.1987), and "lays out an intelligent principle to which an administrative officer or body must conform." *Id.* (quoting *Davis*, 427 A.2d at 336).

In this case, the trial justice noted in his written decision:

"[W]hile the people of the Town are not granted a vote on this specific policy decision, their voice can still be heard regarding this issue. The Town Council still remains answerable to the public for any policy decision they render through a variety of forums. The people of the Town are able to voice their questions and concerns by petitioning the Town Council for grievances and/or attending public hearings on town matters. Most importantly, the people of the Town retain the power to take to the ballot boxes every two years and express, if necessary, their displeasure with their Town Council."

Plainly, this case does not implicate the accountability concerns that arise when the General Assembly delegates decision-making power to unelected administrative bodies or agents.

Moreover, although the 1999 authorization grants the town considerable discretion in determining whether to charge sewer users or all taxpayers for debt service of the sewerage system, that discretion is not unbounded. Under § 9 of the amended act, if the town chooses to include such charges in its annual sewer bills, the charges must be "just and equitable," and they must apply to "all users of the sewerage system [and] all owners of land abutting upon that portion of any street or highway or right of way in which sewers have been constructed." Public Laws 1999, ch. 318, § 1. In addition, the act dictates that "[t]he charges to owners of such abutting land as do not use the sewers shall be less than those charged to users of the sewers," and it sets forth a method for determining the appropriate rate. *Id.* In sum, the sewer enabling act specifically "lays out an intelligent principle" to which the town council must adhere, if it elects to include the charges in its annual sewer bills. *Davis*, 427 A.2d at 336. Therefore, even if the issue had been properly raised and preserved, we conclude that Newport Court's nondelegation argument is without merit.

## Conclusion

In summary, we are of the opinion that the 1999 authorization constituted a proper exercise of the General Assembly's enabling authority under article 13, section 5, of the Rhode Island Constitution, and be-

cause it did not involve the imposition of a tax or the expenditure of money by a town, it did not require the approval of the town's electorate. Consequently, the town properly relied upon the 1999 amendment to its sewer enabling act when it included charges for debt service and capital costs in its 1999–2000 sewer budget. Therefore, we deny and dismiss the plaintiff's appeal, and we affirm the judgment of the Superior Court, to which we return the papers in the case.

Chief Justice WILLIAMS did not participate.

GOLDBERG, Justice, dissenting.

I respectfully dissent. In my opinion, the decision of the majority represents a judicial repeal of a portion of the Rhode Island Constitution without the approval of the voters.

Article 13, section 4, of the Rhode Island Constitution limits the power of the General Assembly over cities and towns that have enacted home rule charters. Although the General Assembly may enact laws "which shall apply alike to all cities and towns," an "act in relation to the property, affairs and government of a particular city or town" is effective only "upon approval by a majority of the qualified electors of the said city or town voting at a general or special election[.]" R.I. Const. art. 13, sec. 4. Significantly, "in the case of acts involving the imposition of a tax or the expenditure of money by a *town*" as opposed to a city, the act "shall provide for the submission thereof to those electors in said town qualified to vote upon a proposition to impose a tax or for the expenditure of money." *Id.* (Emphasis added.) It is this later provision that has been put to rest by the majority today.

There is no doubt that the Constitution of Rhode Island has exclusively reserved to the General Assembly the power to levy and collect taxes and to borrow money, and, pursuant to article 13, section 5, of the Constitution specifically denies to the cities and towns the power to "levy, assess and collect taxes or to borrow money, except as authorized by the general assembly." Thus, it cannot be argued that the state's municipalities must obtain General Assembly enabling authority in matters pertaining to taxation and borrowing. In my opinion, in cases of towns, but not cities, these enabling acts, in accordance with article 13, section 4, must "provide for the submission thereof to those electors in said town qualified to vote upon a proposition to impose a tax or for the expenditure of money." We have said so in 1952 and again in 1996. In the case of *Opinion to House of Representatives,* 79 R.I. 277, 280, 87 A.2d 693, 696 (1952), we advised the honorable members of the House of Representatives concerning the relationship to the General Assembly of a city or town after the adoption of a home rule charter. We specifically held that pursuant to article 28, section 4, now article 13, section 4, an act of the General Assembly was subject to "the further provision that if it involves the imposition of a tax or the expenditure of money by a town, as distinguished from a city," the act must be submitted to the qualified electors. *Opinion to House of Representatives,* 79 R.I. at 280, 87 A.2d at 696.

In *Warwick Mall Trust v. State,* 684 A.2d 252 (R.I.1996), we held that an act of the General Assembly that authorized the Rhode Island Economic Development Corporation and the City of Providence to enter into a long-term tax exemption agreement with the developer of the Providence Place Mall did not require the approval of the voters pursuant to article 13, section 5, of the constitution and, citing to *Opinion to House of Representatives, supra,* we again specifically held that the

challenged legislation did not involve " 'the imposition of a tax or the expenditure of money by a town, *as distinguished from a city * * *.' " *Warwick Mall Trust*, 684 A.2d at 255 n. 9. (Emphasis added.) Thus, we held that the act "does not come within the tax-imposition or money-expenditure-by-a-town provision of article 13, section 4," rather, we concluded that because the enabling legislation related to a city " 'as distinguished from' " a town, article 13 did not apply. *Warwick Mall Trust*, 684 A.2d at 255 n. 9. In the case now before the Court, the act of the General Assembly with which we are concerned relates to a town, and our departure from these holdings has laid this constitutional provision to rest.

I further dissent because, in my opinion, the majority has gone beyond the record in this case and canvassed the state's towns to determine how each municipality enacts its annual budget. In towns that no longer have a financial town meeting, the majority has concluded that article 13, section 4, no longer is applicable because the provision is "vestigial" and may therefore be disregarded by this Court. Although the majority may conclude that a constitutional provision is but an anachronism, it remains part of this state's constitution and it should be upheld. Further, we are faced with an amendment to a previous enabling act in which the voters of the Town of Middletown approved the borrowing of money and, significantly, the manner in which those funds would be repaid. In my opinion, the voters also are entitled to determine whether the repayment provisions should be amended.

The majority has concluded that the Town of Middletown, in accordance with this Court's opinion in *Newport Court Club Associates v. Town Council of Middletown*, 716 A.2d 787 (R.I.1998) (*Newport Court Club I* ), did "exactly" what the Court directed the town to do: "it obtained the General Assembly's authorization to levy charges for debt service and capital improvements." I agree that Middletown, after our decision in *Newport Court Club I*, sought an amendment to its sewer enabling act and based upon that very holding, the town could not change the manner in which it levied taxes to retire its debt without authorization from the Legislature. However, I do not agree that we implied or even hinted that Middletown could accomplish an amendment to its enabling authority without voter approval. Indeed, in *Newport Court Club I*, we noted that "subsequent acts of the General Assembly that have authorized the issuance of additional bonds for sewer expansions * * * have specifically referred to the sewer enabling authority *and have required the approval of [the] electors* " of the town. *Id.* at 791. (Emphasis added.) Thus, the conclusion of the majority that in *Newport Court Club I*, this Court suggested or implied that voter approval no longer was necessary, because otherwise we would "eviscerate and nullify this Court's holding in *Newport Court Club I*," is simply untenable and represents a marked departure from its very holding.

Further, it is not the town's conduct that is in violation of the constitution. It is the enabling act itself that is defective, and not the behavior of the town. Article 13, section 4, mandates that the *act* providing for the imposition of a tax or the expenditure of money by a town "*shall provide for the submission thereof to those electors in said town qualified to vote * * *.*" (Emphasis added.) Thus, the real problem, in my opinion, lies with the act of the General Assembly in failing to provide for voter approval in accordance with article 13, section 4, of the Rhode Island Constitution.

Finally, just as I disagree that this Court may not go beyond the record and

canvass the state's municipalities to determine whether a constitutional provision is "vestigial," nor do I believe that the General Assembly should be burdened with the responsibility of researching how a town adopts its budget before it enacts legislation to enable a municipality to borrow money or levy taxes. Consequently, I dissent.